# EXHIBIT B

[For Covered Employees on Cases Never HRA]

```
------------------------------------------------------------  x
COLLECTIVE BARGAINING AGREEMENT                               :
                                                             :
             between                                         :
                                                             :
1199SEIU UNITED HEALTHCARE WORKERS EAST                      :
                                                             :
               and                                           :
                                                             :
CHINESE-AMERICAN PLANNING COUNCIL HOME                       :
ATTENDANT PROGRAM, INC.                                      :
                                                             :
                                                             :
------------------------------------------------------------  x
```

# TABLE OF CONTENTS

ARTICLE I RECOGNITION ........................................................................................ 2

ARTICLE II UNION SECURITY .................................................................................. 3

ARTICLE III CHECK-OFF ......................................................................................... 4

ARTICLE IV NO DISCRIMINATION ......................................................................... 6

ARTICLE V AGENCY PROCEDURES ....................................................................... 6

ARTICLE VI UNION VISITATION AND BULLETIN BOARD .................................. 8

ARTICLE VII HIRING ............................................................................................... 9

ARTICLE VIII NEW EMPLOYEES - PROBATIONARY PERIOD ........................... 9

ARTICLE IX SENIORITY ........................................................................................ 10

ARTICLE X WAGES ................................................................................................ 12

ARTICLE XI HOURS ............................................................................................... 12

ARTICLE XII WEEKEND SCHEDULING ............................................................... 13

ARTICLE XIII BENEFIT FUND .............................................................................. 13

ARTICLE XIV ........................................................................................................... 14

EDUCATION FUND ................................................................................................. 14

ARTICLE XV HOLIDAYS ....................................................................................... 15

ARTICLE XVI PAID TIME OFF .............................................................................. 16

ARTICLE XVII RESIGNATION .............................................................................. 18

ARTICLE XVIII LEAVE OF ABSENCE .................................................................. 18

ARTICLE XIX JURY DUTY .................................................................................... 19

ARTICLE XX BEREAVEMENT ............................................................................... 20

ARTICLE XXI TRAINING PAY, CARFARE & PHYSICAL EXAMINATIONS ...... 20

ARTICLE XXII MANAGEMENT RIGHTS .............................................................. 21

ARTICLE XXIII DISCHARGE AND PENALTIES .................................................. 23

ARTICLE XXIV CONTRACTING ENTITY(IES) AND PATIENT'S RIGHTS ........ 24

ARTICLE XXV GRIEVANCE AND ARBITRATION PROCEDURE ...................... 25

ARTICLE XXVI SEPARABILITY ............................................................................ 27

ARTICLE XXVII NO STRIKE AND NO LOCKOUT ............................................. 27

ARTICLE XXVIII REIMBURSEMENT .................................................................... 28

ARTICLE XXIX NOTICE ........................................................................................ 29

ARTICLE XXX DURATION OF AGREEMENT ...................................................... 29

AGREEMENT made and entered into this _8th_ day of _August_, 2012 by and between CHINESE-AMERICAN PLANNING COUNCIL HOME ATTENDANT PROGRAM, INC. with its offices at One York Street, 2nd Floor, New York, New York 10013 (hereinafter called the "Employer"), and 1199SEIU UNITED HEALTHCARE WORKERS EAST with its offices at 310 West 43rd Street, New York, New York (hereinafter referred to as the "Union").

WITNESSETH:

WHEREAS, the Employer is engaged in the business of providing home care services to Patients, as defined herein;

WHEREAS, the Employer and the Union are parties to a collective bargaining agreement covering Home Attendants assigned to cases for which the Employer is reimbursed by the New York State Medicaid Management Information Systems and funded by New York State under contract with the City of New York, Human Resources Administration, Personal Care Program and/or other Medicaid funded program of the City of New York ("HRA funded cases"); and

WHEREAS, the Employer and the Union also are parties to a collective bargaining agreement covering Home Health Aides and Personal Care Aides I and II assigned to cases formerly funded by New York State under contract with the City of New York, Human Resources Administration, Personal Care Program and/or other Medicaid funded program of the City of New York ("HRA funded cases"), which cases have been and continue to be assigned to the Employer by Managed Care Organizations ("MCOs") and Managed Long Term Care Providers ("MLTCPs") and other non-HRA Funded Case Programs, excluding the New York City Department for the Aging Funded Care Program; and

WHEREAS, the parties recognize and agree upon the need to enter into a successor collective bargaining agreement that recognizes the differences in levels of reimbursement between cases that were once HRA funded cases and cases that were never HRA funded cases, and

WHEREAS, the Employer and the Union, therefore, wish to enter into a collective bargaining agreement covering Home Health Aides and Personal Care Aides I and II assigned to cases that are assigned to the Employer and funded by MCO, MLTCPs and other non-HRA Funded Care Programs, which were never HRA funded cases; and

WHEREAS, it is the intent and purpose of the parties hereto to promote and improve the mutual interests of the Patients of the Employer as well as of its Employees, to avoid interruptions and interferences with services to Patients and to set forth herein their agreement covering rates of pay, hours of work and conditions of employment of Employees;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

## ARTICLE I
## RECOGNITION

1.      The Employer recognizes the Union as the sole and exclusive collective bargaining representative of Home Health Aides and Personal Care Aides I and II employed by the Employer on cases funded by and assigned to the Employer by MCOs, MLTCPs, or other non-HRA Funded Case Programs, excluding all other employees, including but not limited to Home Attendants and Housekeepers on cases funded by and assigned to the Employer by HRA Funded Case Programs; Home Health Aides and Personal Care Aides I and II on cases transitioned from HRA to MCOs, MLTCPs and non-HRA Funded Case Programs; Registered Nurses, Licensed Practical Nurses, Occupational Therapists, Physical Therapists, Speech

Therapists and all other professional employees licensed or unlicensed. Also excluded from the bargaining unit are all other employees employed by the Employer, including, but not limited to, confidential and managerial employees, supervisors, including Home Health Aide supervisors and/or Personal Care Aides I and II supervisors, technical employees, office clerical employees, temporary or on-call employees as defined herein; and guards and supervisors as defined in the National Labor Relations Act, as amended.

2.     A Home Health Aide is a person employed by the Employer in the job classification of Home Health Aide. A Personal Care Aide I is a person employed by the Employer in the job classification of Personal Care Aide I. A Personal Care Aide II is a person employed by the Employer in the job classification of Personal Care Aide II.

3.     Whenever the word "Employee" is used in this Agreement, it is deemed to mean the employees in the bargaining unit covered by the Agreement as defined in this Article.

4.     This Agreement does not apply to persons used on an "on-call" basis to cover emergency and replacement case assignments.

ARTICLE II
<u>UNION SECURITY</u>

Either (a) membership in the Union or (b) written authorization to the Employer to make Union dues deductions each month will be required of all Employees in the bargaining unit as a condition of employment on or after (1) the 31st day following the beginning of employment or re-employment or (2) the 31st day after the effective date of this Agreement, whichever is the later, and thereafter. Upon the Union's request in writing and upon twenty (20) days written notice to the Employee, the Employer shall discharge any Employee who has failed to pay Union dues as required by this Article. The Employer will have no responsibility to insure that Employees sign and file proper and current check-off authorizations. However, the

Employer agrees to provide newly hired Employees with dues check-off authorization cards at the time of hire and to forward any executed authorization cards to the Union. The Union agrees that it shall indemnify and hold the Employer harmless from any recovery of damages sustained by reason of any action taken under this Article.

ARTICLE III
CHECK-OFF

1.     The Employer shall make monthly deductions from the wages of Employees from whom it has received a written authorization, and remit same to the Union, for the payment of Union membership dues, provided said authorizations will not be irrevocable for a period of more than one (1) year or the duration of this Agreement, whichever is earlier.

2.     The Employer has no responsibility to insure that Employees execute check-off authorizations.

3.     The Employer has no obligation to make dues deductions of any kind from any Employee who, during any dues month involved, has failed to receive sufficient wages to equal the dues deduction.

4.     Upon receipt of a written authorization from an Employee for the 1199 SEIU Political Action Fund the Employer shall, pursuant to such authorization, deduct from the wages due said Employee once a month the sum specified in said authorization and remit same to the 1199 SEIU Political Action Fund as the Employee's voluntary contribution to said Fund.

5.     Upon receipt of a written authorization from an Employee, the Employer shall, pursuant to such authorization, deduct from the wages due said Employee once a month the sum specified in the said authorization and remit same to the 1199 SEIU Credit Union on account of said Employee. The Employer reserves the right to discontinue the check-off for the

1199 SEIU Credit Union for any Employee who makes two or more requests for changes, of whatever nature, in that deduction during a calendar year.

6.    It is specifically agreed that the Employer assumes no obligation, financial or otherwise, arising out of the provisions of this Article, and the Union hereby agrees that it will indemnify and hold the Employer harmless from any claims, actions or proceedings by any Employee arising from deductions made by the Employer hereunder.   Once the funds are remitted to the Union, their disposition thereafter will be the sole and exclusive obligation and responsibility of the Union.   The Union further indemnifies and holds the Employer harmless from any claims, actions or proceedings by any government agency or by any groups arising from deductions made by the Employer for the 1199 SEIU Political Action Fund and/or the 1199 SEIU Credit Union.   Once the funds are remitted to the Union, their disposition thereafter will be the sole and exclusive obligation and responsibility of the Union.

7.    The Employer agrees that the following information will provided to the Union each month:

        a.    names, social security number (last four digits) and dates of hire of current Employees;

        b.    names of new Employees hired from the date the preceding month's information was provided; home addresses, social security number (last four digits) and dates of hire; and

        c.    names and social security numbers (last four digits) of Employees terminated from employment.

8.    The Employer will deduct Union dues, initiation fees and any regular assessment uniformly applied.   Such deductions shall constitute trust funds while in the possession of the Employer.

## ARTICLE IV
## NO DISCRIMINATION

1.     No applicant or Employee shall be discriminated against because of membership in the Union or activities on behalf of the Union and the Union agrees that Employees covered by this Agreement shall be admitted to membership without discrimination.

2.     The Employer and the Union shall comply with applicable city, state and federal laws prohibiting discrimination against or in favor of any Employee on account of race, religion, color, creed, national origin, sex, age, disability, marital status, sexual orientation, citizenship status, or other protected classification.

## ARTICLE V
## AGENCY PROCEDURES

1.     All Employees will receive a copy of their job descriptions and the Employer's Employee Handbook relevant to their position and any changes or modifications thereto, made in the discretion of the Employer, and shall be responsible for adhering to the policies and procedures set forth in the Employee Handbook.

2.     If the job description of an Employee covered under this Agreement is changed as a result of government, Contracting Entity's (see Article IX Section 1(b)) or Employer requirement, the Union shall be notified of the requirement and the change. It is the responsibility of the Employer to define job roles, responsibilities and qualifications; retrain workers, reassign workers and modify jobs; use hourly Employees and temporary workers, as needed; and define and implement each job classification's certification process.

3.     The Employees are required to comply with all health requirements, tests or examinations required by the Employer at the Employer's expense, including annual random drug testing during their employment. Employees may be terminated at any time for failure to successfully complete an annual health physical, or for substance abuse, as provided by law.

Such Employees will not be barred from reapplying for employment if they can successfully complete an annual health physical or, if applicable, have successfully completed a drug rehabilitation program.

4.      In accordance with state regulations, a criminal background check is required for all Employees. Employment is contingent upon successful completion of the criminal background check.

5.      In accordance with federal regulation, an annual competency evaluation is required for all Employees. Continued employment is contingent upon successful completion of the competency assessment in accordance with practice.

6.      Each Employee must attend in-service training as specified by the Employer. Employees will be paid for in-service training.

7.      If any Employee alleges physical harm or threatened physical harm or sexual harassment on the job, the Employer shall investigate the complaint, which may include a visit to the Patient's home, and render a decision in accordance with the Employer's established procedures. The Employee shall be informed immediately of the decision.

8.      Adequate sleeping arrangements must be available for any Employee assigned to a 24-hour live-in case.

9.      The Employer shall provide identification cards which bear the photograph of the Employee. Such identification cards must be carried by the Employee at all times during working hours and must be returned to the Employer by the Employee at the time of the Employee's layoff, resignation, leave of absence, or discharge.

## ARTICLE VI
## UNION VISITATION AND BULLETIN BOARD

1.      The duly authorized representative of the Union shall obtain, in advance, permission from the Program Director of the Employer, or designee, to visit the Employer's main office at reasonable times for the purpose of administering this Agreement, and shall promptly notify the Program Director or designee of his/her arrival on the premises.  The Employer's permission will not be unreasonably withheld.  Such visitation must not interfere with the work of any Employees or the operation of the Employer.  Union representatives may not visit Employees at the homes of clients of the Employer.

2.      The Employer shall supply a bulletin board which will be located in a place convenient to Employees.  This bulletin board may be used by the Union for posting notices limited to the following:

> Notices of recreational and social events;
>
> Notices of Union elections;
>
> Notices of the results of said elections;
>
> Notices of Union meetings; and
>
> Official Union notices.

Such Union notices must not contain matters which, in the opinion of the Employer, are offensive or inappropriate for posting.

3.      Within one month of the execution of this Agreement, the Union shall supply the Employer with a list of all Union delegates who have been appointed and shall notify the Employer of any changes to this list within fourteen (14) days of such occurrence.  One Union delegate for each 200 client cases of the Employer will be released from work for up to twelve (12) paid hours per month, at their regular hour rate of pay, for the purpose of conducting

Union business, including grievance handling, provided that a suitable employee is available as a substitute to cover such delegate's case.

4. No Employee may engage in Union activities on Employer time or in work areas of the Employer other than for the purpose of distributing Union meeting notices on non-work time, except as provided in the Grievance and Arbitration Procedure (Article XXV) of this Agreement.

## ARTICLE VII
## HIRING

1. The Employer agrees to consider qualified applicants for employment as Home Health Aides, Personal Care Aides, and Housekeepers referred from the employment service established, administered and financed by the Union. However, the Employer retains the right, in its sole discretion, to make all hiring decisions and to hire Employees from any source whatsoever.

## ARTICLE VIII
## NEW EMPLOYEES - PROBATIONARY PERIOD

1. Employees will be considered probationary Employees for a period of ninety (90) days, or three hundred sixty (360) working hours from their most recent date of hire by the Agency, whichever is longer, excluding time for any illness or other absence from work.

2. The probationary period may be extended for an additional sixty (60) work days or three hundred sixty (360) working hours with the agreement of the Union, which may not be unreasonably withheld. During or at the end of such probationary period of an Employee, said Employee may be disciplined or discharged at the sole discretion of the Employer and such action shall not be subject to the Grievance and Arbitration Procedure (Article XXV) contained in this Agreement. Probationary Employees will not be entitled to receive paid time off, leaves of absence, and any other benefits as provided herein below. Upon

completion of their probationary periods, Employees will be entitled thereafter to all benefits provided in this Agreement.

## ARTICLE IX
## SENIORITY

1.  Definitions

    a.  "Agency Seniority" means the length of time an Employee has been employed by the Employer in any capacity.

    b.  "Contracting Entity" means an MCO or MLCTP, or other non-HRA Funded Case Programs with which the Employer has contracted to provide home care services to its Patients.

    c.  "Patient" means an individual who has received, receives, or will receive Home Health Aide, Personal Care Aide I or Personal Care Aide II services from the Employer.

2.  Seniority will be computed from the most recent date of continuous employment and applies only with regard to layoff and recall.

    a.  In the event of a layoff, Employees will be laid off in each classification in the inverse order of their Agency Seniority. If a vacancy exists in another classification at the time an Employee is scheduled to be laid off, then the Employee will be assigned to the vacant position in order of Agency Seniority, provided the Employee scheduled for layoff has the certification and qualifications required to perform the vacant position.

    b.  In the event of a recall, Employees will be recalled from layoff in the reverse order in which they were laid off, provided that the Employees who are recalled have the certification and qualifications required, and are available to perform the work required by the Employer. Recall rights shall be limited to twelve (12) months or the length of the Employee's services, whichever is less.

    c.  In the event of a layoff, Employees do not have the right to bump Employees assigned to Patients.

3.  An Employee will lose seniority for any of the following reasons:

    a.  Resignation;

    b.  Dismissal for cause;

c.   Non-placement for more than six (6) consecutive months, unless on an approved leave of absence;

d.   Failure to be available to work for three (3) working days when recalled after a layoff, unless prevented by circumstances beyond the Employee's control;

e.   Failure to return when due after a leave of absence, unless prevented by circumstances beyond the Employee's control;

f.   Failure to contact the Employer within three (3) days after a telephone call and certified letter is sent to the Employee's last known address by the Employer; and

g.   Failure to report to work as assigned without notifying the Employer in the required manner.

4.   The parties recognize that job assignments are in the sole discretion of the Employer, and that various factors are considered, including, but not limited to:

a.   Special language requirement of a Patient;

b.   Contracting Entity and/or Patient requests;

c.   Employer determines that a particular Employee does not fit in with the Patient's needs or attitudes;

d.   Another Employee is better qualified for the position, hours, or geographic location;

e.   Assignment determined by geographic location; and

f.   Seniority.

5.   It is the responsibility of the Employer, not subject to the Grievance and Arbitration Procedure (Article XXV), to assign and reassign Employees to particular Patients, cases or geographic areas.

6.   The Contracting Entity and/or Patient's preference is paramount and always governs.  No Employee placed with a Patient can be bumped by a more senior Employee, placed or unplaced.

7.     This Article does not apply with respect to emergency or temporary replacement of Employees by temporary or "on-call" employees. For such purposes the Employer shall utilize a listing of "on-call" employees irrespective that more senior Employees may be unplaced.

## ARTICLE X
## WAGES

1.     Employees employed on an hourly basis shall receive a Base Rate of Pay (the "Base Rate") for each hour of work as set forth below:

March 1, 2012                                    $9.00 per hour

2.     Employees are eligible to receive Social Security benefits and New York State Unemployment Compensation, Workers' Compensation and Disability Insurance benefits.

3.     Employees assigned as a "live-in" to remain in a Patient's home for a full twenty-four hours in a day will be paid a Per Diem Rate, as set for below:

March 1, 2012                                    $117 per diem

Per Diem Rates are paid without reference to the actual hours worked per day.

4.     All wages shall be paid not less frequently than bi-weekly in cash or by check at the sole option of the Employer, unless the Employee has elected to be paid by direct deposit. Employees hired after the effective date of this Agreement shall be paid by direct deposit.

## ARTICLE XI
## HOURS

1.     Due to the manner in which cases are referred to the Employer, there is no guaranteed work day, week or year, or hours of work for any Employee.

2.     Except in emergencies, no employee shall be required to work more than six (6) consecutive days in a payroll week.

3. Consistent with applicable law, the Employer may designate certain hours on live-in cases as duty free hours.

## ARTICLE XII
## WEEKEND SCHEDULING

1. Any Employee who works more than five (5) days a week and four (4) hours a day may request a schedule of every other weekend off, which will be granted, except:

      a. where such scheduling would result in an unreasonable interference with the efficient operation of the Employer; and

      b. in emergencies.

2. In the event an Employee is granted every other weekend off and then is unable or fails to work on a scheduled weekend, that Employee may be required to work an additional weekend in lieu thereof and will be subject to discipline under the Employer's established procedures.

3. The term "weekend" means Saturday 8 A.M. to Monday 8 A.M.

4. Unpaid leaves will be counted as time off on weekends for purposes of this Article.

## ARTICLE XIII
## BENEFIT FUND

1. The Employer shall become a contributing Employer to the 1199SEIU Home Health Aide Benefit Fund ("Benefit Fund") and shall be obliged to contribute on all hours worked by workers up to the amount of the annual cap as determined in Exhibit A (annexed hereto) section 5(a). Following the period of initial transition into the Fund, as outlined in Exhibit A section 4(a), the Employer shall pay to the Benefit Fund the monthly premiums, as provided in Exhibit A section 1(a), for each eligible Covered Employee who enrolls for coverage, and the hourly administration costs, as provided in Exhibit A section 1(b).

2. The Employer's contributions to the Benefit Fund shall be made no later than the 25th day of each month.

3. The Employer shall make available to the Benefit Fund any pertinent records of Employees that the Benefit Fund requires for its operations and permit the Benefit Fund to audit the Employer's payroll records, as necessary, by an auditor chosen by the Fund.

4. In the event that the Employer shall fail to pay required premiums or provide records or permit audits, the Board of Trustees may commence legal action or may proceed to arbitration under the Trust Agreement. If a violation of the Trust Agreement is found, the Employer shall pay the costs of the action or arbitration, plus legal fees, interest and liquidated damages.

## ARTICLE XIV
## EDUCATION FUND

1. The Employer agrees to participate in and contribute to the 1199SEIU Bill Michaelson Home Care Education Fund, a Labor-Management Training Fund which is created for the sole and exclusive benefit of providing employees with training and education benefits under a Plan of Benefits.

2. Effective April 1, 2012, the Employer shall contribute to the Education Fund at the following rates based upon the number of hours reimbursed to the Employer for work hours paid to Employees.

| | |
|---|---|
| For care to one authorized client in one home | $0.025 per hour |
| For care to two or more authorized clients in the same home at the same time ("Mutual Clients") | $0.0125 per hour (per client) |

In no event shall the contribution rate exceed the Base Rates set forth in this Agreement which are paid to Employees and reimbursed to the Employer.

3. The Employer's contributions to the Education Fund shall be due no later than seven (7) days after the Employer is reimbursed for any work hours paid to Employees.

4. The Employer shall make available to the Education Fund any pertinent records of Employees that the Education Fund requires for its operations and permit the Education Fund to audit the Employer's payroll records, as necessary, by an auditor chosen by the Education Fund.

5. In the event that the Employer shall fail to make contributions or provide records or permit audits, the Board of Trustees may take legal action or may proceed to arbitration under the Trust Agreement. If a violation of the Trust Agreement is found, the Employer shall pay the costs of the action or arbitration, plus legal fees, interest and liquidated damages.

## ARTICLE XV
## HOLIDAYS

1. Employees are eligible for the following seven (7) holidays:

New Year's Day

Martin Luther King Day

Memorial Day

Independence Day

Labor Day

Thanksgiving Day

Christmas Day

2. An Employee will be paid for such holidays only when the holiday falls on a day that the Employee is scheduled to work and has worked. An employee who has not worked that day will not receive holiday pay.

3. An Employee must work the scheduled work day before and the scheduled work day after a paid holiday in order to receive holiday pay unless the Employee has scheduled Paid Time Off or is sick. If an Employee is sick, documentation of such illness from his or her health care provider must be submitted to the Case Coordinator/Personnel Specialist as a condition of receiving holiday pay.

4. An Employee will receive holiday pay equal to time and one-half of the Employee's Base Rate of Pay multiplied by the number of hours scheduled to work on such day to a maximum of twelve (12) hours.

5. An Employee who is paid a Per Diem Rate will receive holiday pay equal to one and a half times the Employee's regular Per Diem Rate of Pay.

6. Employees who are employed as emergency or temporary replacements on holidays are not eligible for holiday pay.

7. If an Employee who is scheduled to work on a holiday wishes to take the day off, such Employee must notify the Employer, in writing, two (2) weeks in advance, and obtain the approval of the Case Coordinator/ Personnel Specialist. The day off will be granted only if a suitable replacement can be found. Under no circumstances will an Employee who is scheduled to work be permitted to take a holiday off without prior notification to the Employer.

ARTICLE XVI
PAID TIME OFF

1. Employees who have completed their probationary period with the Employer shall accrue up to five (5) Personal Time Off Days ("PTO") (60 hours) per fiscal year (July 1 – June 30). PTO will be accrued at the rate of 0.0192 hours multiplied by the actual number of hours worked (one (1) PTO hour earned for every 51 hours worked by the Employee) per week to a maximum accrual of 1.15 hours per week. Notwithstanding anything to the

contrary in this CBA, an Employee assigned as a "live-in" will accrue PTO based on a twelve (12) hours worked per diem.

a. Requests for leave time using PTO must be made by the Employee to the Case Coordinator/Personnel Specialist, in writing, at least two (2) weeks prior to the date of the requested leave, unless the absence is due to sickness or injury, in which case the Employee must call in and report such illness or injury to the Case Coordinator/Personnel Specialist at least two (2) hours prior to the start of the shift, and, if requested, submit a note from his/her physician to the Case Coordinator/Personnel Specialist in order to receive PTO for the illness or injury. Any request for payment of PTO at the time that PTO is taken must be made to the Case Coordinator/Personnel Specialist, in writing, at least two (2) weeks prior to the date the PTO is to begin.

b. On less than two (2) weeks notice, an Employee may request to use one (1) accrued PTO day in any fiscal year for a bona fide emergency.

c. A maximum of two and a half (2.5) PTO days (30 hours) may be carried forward from one fiscal year to another. An Employee may elect a payout at the end of a fiscal year of up to five (5) PTO days (60 hours).

d. An Employee who resigns from the Employer and complies with the requirements of Article XVII (Resignation) will be entitled to receive payment for accrued and unused PTO as of the Employee's date of resignation. An Employee who is terminated for cause is not entitled to receive payment for accrued and unused PTO. Payment of PTO will be calculated at the Employee's Base Rate or Per Diem Rate, as applicable, in effect the time the PTO is used.

## ARTICLE XVII
## RESIGNATION

An Employee who resigns from the Employer shall give two (2) weeks advance notice of his/her resignation, in writing, to the Employer.

## ARTICLE XVIII
## LEAVE OF ABSENCE

1.  Leaves of absence for personal reasons shall be given with permission of the Employer, which permission shall not be withheld unreasonably. Such leaves shall be without pay and may not exceed six (6) months.

2.  Leaves of absence must be requested, in writing, two (2) weeks in advance and no benefits shall accrue during the period of the leave. Failure to return from a leave of absence on the scheduled date may result in termination of employment.

3.  An Employee not on a leave of absence or assigned to another case must be available to work and accept cases as assigned by the Employer.

4.  Family and Medical Leave – Employees eligible under the Family and Medical Leave Act of 1993 ("FMLA") are entitled to up to twelve (12) weeks of unpaid leave within a twelve (12) month period, measured on a "rolling" period backward from the date the leave commences, where the leave is for a FMLA-qualifying reason. When the need for the leave is foreseeable, Employees must provide at least thirty (30) days' notice, ordinarily in writing. When the need for leave is not foreseeable, Employees must provide as much notice as is possible and practicable under the circumstances, ordinarily at least within one (1) or two (2) days after the need for leave becomes known. When the need for the leave relates to a medical condition, Employees must provide a health care provider's certification on a form provided by the Employer for this purpose within 15 days of the request for leave. The Employer may require a second or third opinion, at its own expense, and may, at its sole option, require

recertification and certificates of fitness to return to duty, as permitted under the FMLA. Employees taking FMLA leave must first used any accrued PTO days, all of which will be counted as part of the twelve (12) week FMLA leave entitlement. No other benefits will accrue or be continued during the leave. To the extent required by the FMLA, Employees will be restored to their former position or an equivalent one, provided they return at the end of their scheduled FMLA leave. The Employer will not interfere with or restrain Employees in the exercise of FMLA rights; nor will it retaliate or discriminate against anyone who seeks to enforce these rights.

5.      Except as permitted in Article XXII ("Management Rights") and XXIV ("Contracting Entity(ies) and Patient's Rights"), the Employer shall not convert a temporary to a regular assignment if the result is to replace an Employee who is returning from a) an approved unpaid leave of absence that does not exceed four (4) weeks, or b) an absence that does not exceed eight (8) weeks for which the Employee has received benefits under the New York State Disability or Workers' Compensation Laws.

6.      Union Business Leave - An unpaid leave of absence for a period not to exceed one (1) year will be granted to Employees with one (1) or more years of bargaining unit seniority in order to accept a full time position with the Union, provided such leaves will not interfere with the operation of the Employer.

## ARTICLE XIX
## JURY DUTY

1.      Employees who have completed their probationary period and are required to serve on jury duty shall receive their regular pay or $40, whichever is less, for the first three (3) days of jury duty, if scheduled to work on each of those days, provided that they:

> a.      report to the Employer immediately any receipt of a subpoena or notice to report for jury duty; and

> b.  submit to the Employer written proof, executed by the administrator of the court, of having served on jury duty and the duration of such service.

2.  The Employer may request that an Employee be excused or exempted from jury duty if, in the opinion of the Employer, the Employee's services are essential at the time of the proposed jury duty.

## ARTICLE XX
## BEREAVEMENT

1.  Employees may, upon request, receive a maximum of three (3) consecutive days off without pay in the event of the death of an immediate family member (father, mother, sister, brother, child, spouse, grandparent, grandchild, parent-in-law). This time off must be taken at the time of the funeral. The Employer may require sufficient verification of the death. It is the Employee's responsibility to timely notify the Employer of an intent to take bereavement leave.

## ARTICLE XXI
## TRAINING PAY, CARFARE & PHYSICAL EXAMINATIONS

1.  The Employer shall pay its Employees who are working on active cases for time spent in meeting the minimum training requirements in training programs required by the Employer.

2.  In the event an Employee is assigned to more than one (1) client household in the same work day, the Employee will be reimbursed for the fare expended from client 1 to client 2. The cost of such travel is not to exceed three (3) standard Metropolitan Transportation Authority fares from one client's home to the second client's home.

3.  Each Employee must take physical examinations and attend in-service training as specified by the Employer. A scheduled physical exam or in service training date that conflicts with an Employee's paid time off or other approved absence will be rescheduled at the

Employee's request provided that the time to reschedule under the Agency's procedures has not expired.

        4.      Physical examinations will be provided by the Employer at no expense to the Employee.

## ARTICLE XXII
## MANAGEMENT RIGHTS

Except to the extent expressly limited by a specific provision of this Agreement or by operation of law, the Union agrees that the management of the Employer and the direction of the work force is in the sole discretion, and is the sole responsibility, of the Employer, and the Employer reserves and retains, solely and exclusively, all of its rights, functions and prerogatives of management including, but not limited to, the right to hire new Employees from any source; to discharge Employees; to promote; to demote; to schedule, to transfer; to reprimand; to discipline; to suspend; to direct Employees in their work; to assign or reassign work; to direct and schedule Employees' workweeks and working hours thereof; to change or alter Employees' scheduled workweeks or the working hours thereof, to classify Employees; to reclassify Employees; to lay off Employees; to recall Employees; to introduce new or improved methods or facilities; to control all Employer property; to require the assignment of additional duties; to make, promulgate, change and require Employees to observe reasonable Employer rules, regulations, policies and practices, including those policies and procedures set forth in the Employee Handbook; to decide the type and quantity of services to be rendered to Patients; to direct, designate, schedule and assign duties to the work force; to plan, direct and control the entire operation of the Employer; to establish, expand, reduce, alter, abolish, discontinue, consolidate, combine or reorganize any corporation, facility, job classification, department, division, operation, service, branch, team, cluster, or other unit of the Employer with any consequent

reduction or other change in the work force regardless of whether or not the same causes a reduction in the work force; to determine the number of Employees and the duties to be performed; to maintain the efficiency of Employees; to determine the qualifications, size and composition of the work force; to transfer any or all Employees between and among any corporations, facilities, job classifications, departments, divisions, operations, services, branches, teams, clusters or other units of the Employer; to redefine and transfer any or all corporations, facilities, job classifications, departments, divisions, operations, services, branches, teams, clusters or other units to any other location or to discontinue the same in whole or in part at any time; to merge with any other institution; to make technological improvements; to install or remove equipment and change job duties and job procedures regardless of whether or not such action causes any reduction of any kind in the number of Employees, transfers in the work force, requires the assignment of additional or different duties or causes the elimination or addition of titles or jobs; to determine, establish and administer the facilities, policies and procedures related to patient care, research, education, training, operations, services and maintenance of the Employer; to control and regulate the use of facilities, supplies, equipment and other property of the Employer; to determine the number, location and operation of corporations, facilities, job classifications, departments, divisions, operations, services, branches, teams, clusters or other units; to introduce new or improved methods or facilities regardless of whether or not the same cause a reduction in the work force; to decide whether or not the Employer is financially or otherwise able to continue in operation and the extent thereto; to contract out, subcontract or outsource, any work which the Employer deems desirable including, but not limited to, the services of temporary service agencies; to otherwise carry out the ordinary and customary functions of management whether or not possessed or exercised by the Employer prior to the

execution of the Agreement; and to otherwise generally manage the Employer, attain and maintain full efficiency and optimum patient care. All rights, powers, discretion, authority and prerogatives possessed by the Employer prior to the execution of this Agreement, whether exercised or not, are retained by and are to remain exclusively with the Employer. None of these rights shall be exercised in any arbitrary or capricious manner. The Union, on behalf of the Employees, agrees to cooperate with the Employer to attain and maintain full efficiency and maximum patient care.

## ARTICLE XXIII
## DISCHARGE AND PENALTIES

1. The Employer has the right to discharge, suspend or discipline any Employee for cause. Cause includes, but is not limited to, Contracting Entity and/or Patient's complaints and violations of rules and regulations promulgated and published by the Employer.

2. The Employer shall send or give notice to the Union of any suspension or discharge of an Employee within forty-eight (48) hours thereafter. If the Union desires to contest a discharge or suspension, it shall give written notice thereof to the Employer within five (5) working days. In such event, the dispute must be submitted and determined under the Grievance and Arbitration Procedure (Article XXV) of this Agreement, however, commencing at Step 2 of the Procedure in the case of a suspension and Step 3 of the Procedure in the case of a discharge.

3. If the discharge or other discipline of an Employee results from conduct relating to a Patient or Contracting Entity and the Patient and/or Patient-related individuals with personal knowledge of the case do not appear at an arbitration held under the Grievance and Arbitration Procedure herein, the arbitrator may not consider the failure of the Patient and/or Patient-related individuals to appear as prejudicial.

4. An arbitrator, in rendering his or her decision, shall evaluate, along with the case presented by the Union and/or Employee, the process, records and judgment of the Employer in arriving at its decision and shall give paramount consideration to the Employer's obligation to protect the interests of the Patients.

## ARTICLE XXIV
## CONTRACTING ENTITY(IES) AND PATIENT'S RIGHTS

1. It is agreed between all parties that the Contracting Entity(ies) and/or Patients have all rights specified in the contracts between the Employer and the Contracting Entity(ies). These rights include, but are not limited to, the right of Contracting Entity(ies) and/or Patients to request the replacement of an Employee, to inform the Employer of the reasons therefore, and to require that the Employer comply with such reasonable request. Such removal and replacement of an Employee is not subject to the Grievance and Arbitration Procedure (Article XXV). On request, the Employer shall inform the Union of the reason for the replacement of the Employee.

2. The Union, on behalf of the Employees, agrees to cooperate with the Employer to attain and maintain full efficiency and maximum client care.

3. In cases where the Patient or Contracting Entity(ies) requests removal of the Employee, the Employer is bound to honor the Patient's or Contracting Entity's(ies') wishes immediately. However, to protect the Employee's rights, the Employer shall make reasonable efforts to properly investigate such a request within five (5) days. If the Employer deems the Patient's or Contracting Entitys'(ies') request to be without basis, and the Patient or Contracting Entity(ies) refuses to allow reinstatement, the Employee will be reassigned as promptly as possible. Further, the parties agree that withdrawing an Employee from an assignment due to a

Patient or Contracting Entity's(ies') complaint will not be deemed discipline, discharge or suspension.

## ARTICLE XXV
## GRIEVANCE AND ARBITRATION PROCEDURE

1.      A grievance is defined as any dispute between the Union (on its behalf and/or on behalf of any Employee) with the Employer involving the proper application, interpretation, or compliance with the specific written provisions of the Agreement based on facts and circumstances occurring during the term of this Agreement. A grievance is subject to arbitration.

2.      Grievances will be resolved in accordance with the following procedure:

Step 1--     The Employee or the Employee's representative shall present the grievance directly to the Employee's supervisor or his/her designee within ten (10) days after the occurrence which gave rise to the grievance, or the date on which the Employee knew or should have known of same, whichever occurs later. The supervisor shall respond within ten (10) days after presentation of the grievance.

Step 2--     If the matter is not resolved in Step 1, the Union shall reduce the grievance to writing and present it to the Director of Patient Services or his/her designee within ten (10) days after the supervisor's response at Step 1. The Director of Patient Services shall respond within ten (10) days.

Step 3--     If the grievance is not resolved at Step 2, the Union may within ten (10) days thereafter present the grievance in writing to the Program Director of the Employer, or his/her designee, who shall render his/her response within ten (10) days thereafter.

Step 4--     If the grievance is not resolved at Step 3, the Union may within ten (10) days thereafter

request that the matter be submitted for final and binding arbitration under the Labor Arbitration Rules of the American Arbitration Association.

3. Notwithstanding the foregoing, a grievance that affects a substantial number of Employees and is outside the authority of the Employer's representatives designated in Steps 1 and 2 may be presented initially at Step 3 of the grievance procedure. This grievance must be presented in writing and within ten (10) days of the occurrence which gave rise to the grievance.

4. All time limits herein specified are exclusive of Saturdays, Sundays and holidays.

5. The opinion and award of the arbitrator must be made in writing and is final and binding upon all parties. The arbitrator has full authority to decide the issue or issues in dispute, except that s/he does not have authority to amend, alter, modify, add to or subtract from the provisions of this Agreement.

6. The fees and expenses of this arbitration will be borne equally by the parties. A party requesting a stenographic record of the arbitration hearings will pay for that record, unless otherwise agreed by the parties.

7. Whenever time limits are specified within the grievance and/or arbitration procedures, those limits are to be strictly construed and the failure of the Union to file a timely grievance or take any action called for will be deemed a waiver thereof. The failure of the Employer to respond to a grievance at any step of the Grievance procedure will be deemed a denial of the grievance and the Union may proceed to the next step as of the date the Employer's response was due. The parties may mutually agree in writing to waive or extend any time limit,

26

and/or to waive any step in the grievance procedure. It is further agreed that time is of the essence in arbitration and both parties will exert their best efforts to obtain a speedy decision.

## ARTICLE XXVI
## SEPARABILITY

It is understood and agreed that all agreements herein are subject to all applicable laws now or hereafter in effect; and to the lawful regulations, rulings and orders of regulatory commissions or agencies having jurisdiction. If any provision of this Agreement is in contravention of the laws or regulations of the United States or of the State of New York or the City of New York, such provision will be superseded by the appropriate provision of such law or regulation, so long as same is in force and effect; but all other provisions of this Agreement will continue in full force and effect.

## ARTICLE XXVII
## NO STRIKE AND NO LOCKOUT

1.      No Employee will engage in any strike, sit-down, sit-in, slow-down, cessation or stoppage or interruption of work, boycott, or other interference with the operations of the Employer.

2.      The Union, its officers, agents, representatives and members, shall not in any way, directly or indirectly, authorize, assist, encourage, participate in or sanction any strike, sit-down, sit-in, slow-down, cessation or stoppage or interruption of work, boycott, or other interference with the operations of the Employer, or ratify, condone or lend support to any such conduct or action.

3.      In addition to any other liability, remedy or right provided by applicable law or statute, should a strike, sit-down, sit-in, slow-down, cessation or stoppage or interruption of work, boycott, or other interference with the operations of the Employer occur, the Union, within twenty-four (24) hours of a request by the Employer, shall:

a. Publicly disavow such action by the Employees;

b. Advise the Employer in writing that such action by Employees has not been called or sanctioned by the Union;

c. Notify Employees in writing of its disapproval of such action and instruct such Employees to cease such action and return to work immediately; and

d. Post notices on the bulletin board supplied by the Employer advising that the Union disapproves such action, and instructing Employees to return to work immediately.

4. During the term of this Agreement, the Employer shall not engage in a lock-out provided that a decision by the Employer to shut down for any reason or to merge or discontinue any part of its operations or functions, or to exercise its right of assignment, in a bona fide exercise of its management rights as set forth in this Agreement will not be deemed to be a lockout.

5. It is specifically agreed that the rights of the Union under this paragraph pertain solely to the present contract and that their inclusion in this contract will not be a basis for inclusion of such rights in any future contract.

## ARTICLE XXVIII
## REIMBURSEMENT

1. The parties recognize that the Employer must receive adequate reimbursement from Contracting Entity(ies) to pay for the wages and benefits herein and is dependent upon such reimbursement for the continued implementation of the economic terms of this Agreement.

2. In the event that the Employer claims that it cannot implement any economic term or condition of this Agreement on the basis of a claim of inadequate reimbursement (including volume, mix of rate reimbursement, or a failure to receive an appropriate increase in the rate necessary to fund the Agreement) from Contracting Entity(ies),

the Employer shall notify the Union in writing, and the Employer and the Union shall meet and discuss whether any adjustments may be necessary to terms of the Agreement. If the parties are unable to agree on adjustments for either an increase or a decrease in compensation within fifteen (15) days, either party may make an application for relief from Martin F. Scheinman, the Impartial Chairperson (herein referred to as the "Impartial Chairperson") who shall determine whether and to what extent adjustments in the terms of the Agreement are warranted. Any award by the Impartial Chairperson shall be deemed a final and binding award enforceable in a court of competent jurisdiction.

3.   Subsequent to application for relief to the Impartial Chairperson, and pending a determination by the Impartial Chairperson, the Employer shall pay such economic benefits hereunder to the extent it asserts it is able to do so. In the event the Impartial Chairperson determines that the application for relief was not made in good faith and was frivolous, the Employer, in addition to being required to comply with the terms of the Agreement, may be required by the Impartial Chairperson to pay for all costs resulting from unnecessary hearings caused by the application. Such costs shall include all costs and expenses of the Union's attorneys and accountants and of the Impartial Chairperson.

### ARTICLE XXIX
### NOTICE

Any notice provided for in this Agreement shall be in writing to the Union at its headquarters at 310 West 43rd Street, New York, New York 10036, and to the Employer at its place of business at One York Street, 2nd Floor, New York, New York 10013.

### ARTICLE XXX
### DURATION OF AGREEMENT

This agreement shall continue in full force and effect for the period commencing April 1, 2012 and ending February 28, 2013.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed by their respective duly authorized officers this ____ day of ____, 2012.

This Agreement is subject to ratification by the Union membership and by the Board of Directors of the Employer.

1199SEIU UNITED HEALTHCARE WORKERS EAST

By: _Maria Castaneda_

CHINESE-AMERICAN PLANNING COUNCIL HOME ATTENDANT PROGRAM, INC.

By: _____ 8/9/12

Ling Ma
Program Director

## Exhibit A

1.  <u>Employer Contributions to the Fund</u>:   The Employer shall pay contributions to the 1199SEIU Home Health Aide Benefit Fund ("Benefit Fund") as follows:

a.  Beginning on the Benefits Effective Date, as defined below in Paragraph 4, the Employer shall pay $501.33 per month to the Benefit Fund, or any increased contribution rate as determined by the Trustees for the period after December 31, 2012, for each eligible Aide who actually enrolls in the New HIP Plan, in accordance with the procedures and requirements set forth below.

b.  The Benefit Fund shall administer the New HIP Plan and the Employer, beginning on the Benefits Effective Date, shall pay administration costs to the Benefit Fund in the amount of $.04 per hour for all hours paid to Aides which are reimburseable to the Employer, or any modification of the administration cost as determined by the Trustees. Hours which are reimburseable to the Employer shall not include hours paid to Employees for in-service training, specialty training, travel time, annual leave, or other leave. The Employer may withhold payment on the administration costs in the amount of 1% of the hours paid to Employees in the month for which contributions are due, subject to a reconciliation of actual reimbursement 12 months after the applicable month, consistent with the May 14, 2003 arbitration award of M. Scheinman in *In re Progressive Home Health Services, Inc. and 1199SEIU.*

c.   The Employer's contributions to the Benefit Fund shall be made monthly. Payments shall be due no later than the 25th day of each month.

d.   The Employer shall make available to the Benefit Fund any pertinent records of Employees that the Benefit Fund requires for its operations and permit the Benefit Fund to audit the Employer's Employee payroll records, as necessary, by an auditor chosen by the Benefit Fund.

e.   In the event that the Employer shall fail to make contributions or provide records or permit audits, the Board of Trustees may commence legal action or may proceed to arbitration under the Trust Agreement. If a violation of the Trust Agreement is found, the Employer shall pay the costs of action or arbitration, plus legal fees, interest and liquidated damages.

2.   <u>Employee Co-Premium</u>: Beginning on the Benefits Effective Date, each eligible Employee who actually enrolls in the New HIP Plan shall pay $5.00 per week, deducted pre-tax from his/her gross weekly pay, to the Employer for the Employee's share of the premium.

3.   <u>Eligibility</u>: The Employee's eligibility to participate in the New HIP Plan shall be determined as follows:

a.   <u>Open Eligibility Periods</u>: By the deadline of each of the Open Eligibility Period Deadlines set forth below, all non-trainee, non-probationary Employees who have worked an average of 120 hours per month for the two-month eligibility period determined by

the Benefit Fund shall be eligible to enroll in the New HIP Plan, as of the Effective Date of Enrollment corresponding to the Open Eligibility Period Deadline, as set forth below.

b.  Potential Enrollment:  By the deadlines of each of the Open Eligibility Periods set forth below, all eligible Employees who newly choose to enroll in the New HIP Plan shall sign up, as required, and agree to pay $5.00 per week commencing with the corresponding Effective Date of Enrollment, as set forth below. By the deadlines of each of the Open Eligibility Periods, all eligible Employees who were previously enrolled in the New HIP Plan shall remain in the Plan, provided they continue to be eligible and pay $5.00 per week.

c.  The following sets forth the deadlines for the Open Eligibility Periods and the corresponding Effective Dates of Enrollment:

| Open Eligibility Period Deadline | Effective Date of Enrollment |
|---|---|
| December 1st | January 1st of the following year |
| March 1st | April 1st |
| June 1st | July 1st |
| September 1st | October 1st |

4.  Benefits Effective Date

a.  The Benefits Effective Date shall be six months following the hire of the first Employee to be covered under the Collective Bargaining Agreement which applies to Home Health Aides and Personal Care Aides I and II assigned to cases that are assigned to the Employer and funded by MCO, MLTCP and other non-HRA

Funded Care Programs, which were never HRA funded cases ("the Never HRA CBA").

b.  The Gross Annual Cap, referred to below in Paragraph 5, shall be calculated from the hire of the first Employee to be covered under the Never HRA CBA.

5.  <u>Employer Gross Annual Cap</u>:

a.  <u>Employer Gross Annual Cap</u>:  For each calendar year, the Employer's annual contributions, including administrative costs, under the New HIP Plan as set forth in paragraphs 1(a) and (b) above, shall not exceed the hourly health contribution rates set forth below, multiplied by the total number of hours paid to Aides which are reimburseable to the Employer:

2012: $1.02 per hour

2013: $1.10 per hour

6.  <u>Maximum Designated Enrollees Under the Employer's Annual Cap</u>: The specific number of Aides who can be designated to actually enroll under the Employer's Annual Cap shall be calculated by dividing the Net Annual Cap by the Net Annual Premium:

a.  The Net Annual Cap shall be counted as the total hours paid to Aides which are reimburseable to the Employer multiplied by the applicable hourly health care contribution rate set forth above, net of administration costs.  The estimated annual hours shall be calculated prior to the beginning of the calendar year by using the preceding three months for which there are complete records, multiplied by 4.

b.     The Net Annual Premium shall be computed as the monthly premium established by the Trustees, net of the Aides' monthly co-premium payment, multiplied by 12.

c.     For any partial year, the Net Annual Cap and the Net Annual Premium shall be computed from the Benefits Effective Date.

d.     If the number of potential enrollees (eligible Aides who have indicated their interest in enrolling in the New HIP Plan as of the applicable Open Eligibility Period Deadline) is less than or equal to the number of designated enrollees, as calculated above, then all potential enrollees will be permitted to actually enroll in the New HIP Plan for that open period.

e.     If the number of potential enrollees (eligible Aides indicating their interest in enrolling in the New HIP Plan as of the applicable Open Enrollment Eligibility Deadline) is more than the number of designated enrollees, as calculated above, then the actual enrollment will be limited to the number of designated enrollees, by the Employees' seniority, as set forth below.

f.     Seniority shall be as defined in Article IX of the Collective Bargaining Agreement.

g.     In advance of any Open Eligibility Period, the Employer shall have the option to request a recalculation of the Employer Gross Annual Cap based on the three month period just prior to the Open Eligibility Period deadline for which there are complete records. If

the recalculation results in a determination that the Employer Gross Annual Cap shall be reduced, the Maximum Designated Enrollees shall be adjusted immediately.

7. <u>Maintenance of Enrollment</u>. An eligible Employee who is actually enrolled in the New HIP Plan and who continues to maintain eligibility cannot be bumped out of the New HIP Plan by a more senior Employee who subsequently becomes eligible, or elects to enroll during a subsequent open period.

8. <u>Actual Enrollees Must Maintain Eligibility</u>: Once an eligible Employee actually enrolls in the New HIP Plan, the eligible Employee must meet the eligibility requirements and continue to pay the required co-premium. In the event that an eligible Employee actually enrolls in the New HIP Plan but does not work more than an average of 120 hours per month during the eligibility period determined by the Benefit Fund or fails to pay the required co-premium, then the Employee shall no longer be eligible to participate in the New HIP Plan and shall be dropped from the New HIP Plan, until the Employee meets the eligibility requirement for any subsequent eligibility period, provided there is an available slot based upon the Employee's seniority, as defined above. In accordance with applicable law the Employee will be provided with COBRA notification by the Benefit Fund. Notwithstanding the foregoing, any Employee who is on an approved leave of absence (disability, workers compensation, FMLA) and does not work an average of 120 hours per month shall not be dropped from the New HIP Plan while they are on such leave of absence, or for the first two (2) months after his/her return to work provided that the Employee: (1) continues to pay the applicable co-premium; (2) maintains his/her seniority with the Employer; and (3) the Employee is not

otherwise ineligible for continued health insurance due to Employer Annual cap limitations provided for by this Agreement.

9. Employees are permitted to revoke their enrollment at any time by providing written notice to the Benefit Fund.

10. <u>Look Back Gross Annual Cap</u>: By November 15th of each year, the Employer agrees to provide to the Union and the Benefit Fund all documents showing the number of hours paid to the Aides and reimburseable to the Employer during the prior 12 month period for which there are complete records. The parties agree to meet by December 1st of each year to review such records at which time the Employer's Look Back Gross Annual Cap will be calculated as follows: the total number of hours paid to Aides and reimbursed to the Employer for the preceding twelve months for which there are complete records will be multiplied by the amounts set forth below.

2012: $1.02

2013: $1.10

11. <u>Look Back Bonus</u>. In the event the Employer's total premium and administrative cost payments, net of Employee contributions, is less than the Look Back Gross Annual Cap for that year, as set forth below, the difference shall be paid as a bonus to all non-trainee, non-probationary Employees by no later than December 31st of each year. The parties shall meet regarding how to distribute the money available for such bonus. Calculation of the amount of bonus monies available for distribution shall be reduced by the Employer's cost of such distribution, to include Social Security, Medicare, Workers' Compensation, MTA Tax, FUTA and State Unemployment Tax. Workers' Compensation costs shall only include the portion attributable to coverage for the current year and shall not include any settlement costs or

other costs from prior year liabilities. In the event that a dispute arises concerning the amount of funds available for the bonus, it shall be subject to expedited arbitration.